## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**THOMAS P. McCARTHY,**                                    Chapter 7
    Debtor                                            Case No. 10-11788-JNF
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
**ROBIN SINGH EDUCATIONAL SERVICES, INC.,**
**d/b/a TESTMASTERS,**
    Plaintiff
v.                                                         Adv. P. No. 10-1309
**THOMAS P. McCARTHY,**
    Defendant
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Amended Complaint filed by the Plaintiff, Robin Singh Educational Services, Inc., d/b/a TestMasters (the "Plaintiff" or "TestMasters") against the Debtor, Thomas P. McCarthy (the "Debtor"), pursuant to which it objects to the Debtor's discharge under 11 U.S.C. § 727(a)(3), 727(a)(4), and 727(a)(2)(B)(Counts III-V, respectively). Additionally, it seeks to have a debt owed to it by the Debtor excepted from discharge under 11 U.S.C. § 523(a)(6) and 523(a)(4)(Counts I and II, respectively) based upon the preclusive effect of an amended judgment entered by the Superior Court of the State of California for the County of Los Angeles.

The Court conducted a two-day trial on May 29, 2012 and May 30, 2012 at which two witnesses testified and numerous exhibits were introduced into evidence. The Court deferred consideration of Counts I and II of the Amended Complaint as a judgment in favor

of TestMasters on Counts III through V would obviate the need to address Counts I and II.

The Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(J) over which this Court has jurisdiction pursuant to 28 U.S.C. § 1334(a) and (b) and the order of reference from the United States District Court for the District of Massachusetts.

## II. FACTS

The Debtor is well-educated and intelligent.  He graduated from American University in Washington, D.C. and obtained both a Masters Degree in International Policy from the Monterey Institute of International Studies in 1991 and a Masters Degree in Education from the Harvard Graduate School of Education in 2011.  He scored in the ninetieth percentile on the Graduate Record Examination.  He is presently employed at the Harvard Graduate School of Education in the Admissions Office where he engages in data analyses and provides general technological support through the maintenance of a portion of the school's website.  Prior to his employment at Harvard University, he was employed as "lead web developer" for Anteris Systems, a small technology support company located  in Western Massachusetts.

The Debtor filed a voluntary Chapter 13 petition on February 24, 2010.  On Schedule A-Real Property, he did not list an ownership interest in any real property.  On Schedule B-Personal Property, he disclosed $18 in cash; $218 in an account at NESC Federal Credit Union, miscellaneous items of furniture and a television worth less than $2,685, used clothing, and a laptop computer worth $400, all of which he claimed as exempt on Schedule

2

C-Property Claimed as Exempt.  On Schedule E-Creditors Holding Unsecured Priority

Claims, the Debtor listed the Internal Revenue Service as the holder of claims relating to

unpaid income taxes for 2008 and 2009, totaling $3,575.68.  On Schedule F-Creditors Holding

Unsecured Nonpriority Claims, the Debtor listed three creditors:  the Los Angeles Superior

Court with a claim for court reporter services totaling $603, Sovereign Bank with a claim

relating to an overdraft due to "seizure on trustee process" in the sum of $706, and

TestMasters with a claim in the sum of $624,070.24, which the Debtor indicated was disputed.

In his Answer to TestMasters Amended Complaint, however, the Debtor  admitted that it

holds an amended final judgment, dated July 28, 2009 in the amount of $624,070.24.  The

judgment, which includes interest and attorneys' fees, was entered following a seven-day

jury trial in an action brought by TestMasters against the Debtor for breach of contract,

conversion and trespass to chattels.[1]

---

[1] Section 109(e) of the Bankruptcy Code provides that only an individual who owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $360,475 may be a debtor under Chapter 13.  Because the debt owed to TestMasters far exceeded $360,475 the Court  can only surmise that the provisions of 11 U.S.C. § 1328(a) motivated the Debtor to commence a Chapter 13 case to obtain the discharge of a debt which arguably would be excepted from discharge in a Chapter 7 case.  *Compare* 11 U.S.C. § 1328(a)(2) *with* 11 U.S.C. § 523(a)(6).  Both the Chapter 13 Trustee and TestMasters moved to dismiss the Debtor's Chapter 13 case citing § 109(e).  Indeed, TestMasters stated:

> There can be no doubt that the Debtor's only reason for filing this Chapter 13 case was to thwart a single creditor, TestMasters. The Debtor's proposed Chapter 13 Plan provides for no payment of any kind to TestMasters or any other unsecured, nonpriority creditor. Instead, the only parties to be paid under the Debtor's proposed Chapter 13 Plan are the Internal Revenue Service, on a nondischargeable priority unsecured debt of $3,575.68, and the Debtor's counsel's additional attorneys' fees of $5,500.00. This manipulation of a Chapter 13 proceeding should not be condoned.

3

On Schedule I-Current Income of Individual Debtor(s), the Debtor listed his monthly income from his employment at the Harvard University Graduate School of Education and self-employment income of $250 per month. The Debtor signed his Schedules under penalty of perjury, attesting that he had "read the foregoing summary and schedules, consisting of 16 sheets, and that they are true and correct to the best of my knowledge, information, and belief."

In his Statement of Financial Affairs, the Debtor disclosed that TestMasters had commenced an action in the Norfolk Superior Court Department of the Trial Court to enforce its California judgment and had seized $1,585.55 from a Sovereign Bank account "pursuant to a trustee summons." The Debtor did not list that bank account on Schedule B.

The Debtor in his original Schedule B disclosed only the NESC Federal Credit Union account with a balance of $218. In fact, the balance in the account for the month of February 2010 was never less than $1,823.95. The Debtor testified at a Rule 2004 examination conducted by TestMasters on September 14, 2010, a portion of which was read into the trial record, that he believed he had withdrawn monies in person from the NESC Credit Union account some time between February 1, 2010 and the petition date in order to pay his

---

Moreover, the Debtor's Chapter 13 Plan seeks to discharge a debt that TestMasters submits would be nondischargeable in a Chapter 7 case, under either 11 U.S.C. § 523(a)(4) or § 523(a)(6), since the jury specifically found the Debtor liable for the conversion or trespass to chattels with malice or oppression. TestMasters submits, therefore, that the Debtor has not filed this Chapter 13 case in good faith and, on such additional grounds, this case should be dismissed.

The Debtor converted his case to a case under Chapter 7 on May 7, 2010 prior to the hearing scheduled on TestMaster's motion to dismiss.

4

monthly rental obligation. The Debtor's testimony at his Rule 2004 examination, however, was untrue as the statement from the NESC Federal Credit Union account did not reveal any such withdrawals. Furthermore, the Debtor contradicted his deposition testimony at trial, stating that he never withdrew any monies in person or otherwise between February 1, 2010 and the petition date from that account.

With respect to the NESC Credit Union account, the Debtor testified that he wrote a check on March 7, 2010 payable to his father, Paul McCarthy, for $1,700 drawn on that account. Because the Debtor made no deposits into the NESC Credit Union account between the petition date and March 7, 2010 when he wrote the $1,700 check, TestMasters established that the account contained well in excess of $218 at the time of the commencement of the Debtor's case and that the Debtor failed to disclose approximately $1,600 in the NESC Credit Union account on Schedule B.

When the Debtor filed his bankruptcy petition, he had several other bank accounts in addition to the the NESC Federal Credit Union account and the Sovereign Bank account which TestMasters seized. The Debtor had another bank account at Sovereign Bank, ending in account number 2829, which he opened using his father's name and into which he deposited the $1,700 withdrawn from the NESC Federal Credit Union account on March 7, 2010. The Debtor opened the Sovereign Bank account on January 7, 2010, approximately seven weeks before he commenced his Chapter 13 case and used it as his own both before and after February 24, 2010. He made cash deposits into the Sovereign Bank account totaling more than $4,500.00 on January 19, 2010, February 1, 2010, and February 12, 2010. The

Debtor admitted that all the transactions pertaining to the Sovereign Bank account before the petition date, including deposits, checks written, and purchases made, were transactions initiated by him and for his own benefit. He used that Sovereign Bank account both prepetition and postpetition, but failed to disclose its existence on his original Schedule B, in his First Amended Schedules, filed on May 13, 2010, or on his Second Amended Schedules, filed on September 22, 2010.

The Debtor finally disclosed the Sovereign Bank account on his Third Amended Schedule B which he filed on November 22, 2011, approximately 21 months after the commencement of his case and almost one year after TestMasters commenced this adversary proceeding. The Sovereign Bank account was disclosed only after TestMasters obtained a subpoena for the records of the NESC Credit Union account. The Debtor produced only three bank statements (none for the month when the petition was filed in February 2010) and did not produce any checks for the NESC Credit Union account before his Rule 2004 examination which TestMasters conducted on September 14, 2010. Indeed, the Debtor admitted shredding bank statements.

The Debtor testified at his Rule 2004 examination conducted by TestMasters on September 14, 2010 (the relevant portion of which were read into the trial record) that he did not have any other bank account with any other person with check writing authority from January 1, 2006 through the petition date. The Debtor's testimony was untruthful. Although the Debtor testified that he opened the Sovereign Bank account for purposes of having a checking account to pay his rent and other bills, he also had opened a Bank of America

6

checking account ending in number 4446 on January 30, 2010, less than thirty days before he filed his Chapter 13 case.  In addition, he opened a Bank of America savings account ending in number 5813 on the same day.

The Debtor used the Bank of America checking account for numerous transactions in the immediate weeks before the filing of his First Amended Schedules on May 13, 2010, the accuracy and completeness of which he affirmed in his sworn declaration under penalty of perjury on May 11, 2010 and in his testimony at the § 341 meeting conducted by the Chapter 7 Trustee following the conversion of his Chapter 13 case to a case under Chapter 7.  That § 341 meeting was held on June 15, 2010.  The Debtor's employer, Harvard University, directly deposited his paychecks into the Bank of America checking account on April 23, 2010 and on May 7, 2010. Those direct deposits were made shortly before the Debtor verified under oath the accuracy of his First Amended Schedules and confirmed through his  testimony at the § 341 meeting in response to the Trustee's questions on June 15, 2010.  The Debtor failed to disclose the existence of either the Bank of America checking account or the Bank of America savings account in his First Amended Schedules, and he testified at the June 15, 2010 § 341 meeting that any Bank of America accounts were opened postpetition.

The Debtor promptly withdrew the funds deposited in the Bank of America checking account by Harvard University and deposited all or almost all the money into the Sovereign Bank account in his father's name in the weeks immediately preceding the filing of his First Amended Schedules on May 13th.  He also made a cash deposit of $100 in the undisclosed Bank of America checking account two days before the petition date.  The Debtor testified

7

at trial that he borrowed $4,000 from his friend, Trent Teti ("Teti"). He provided Teti with the bank account number for the Bank of America savings account and Teti wire transferred $4,000 to that account on May 5, 2010, approximately one week before the Debtor filed his First Amended Schedules.  The Bank of America savings account into which Teti wire transferred $4,000, as noted above, was not disclosed on the Debtor's First Amended Schedules.  In addition, the Debtor deposited or caused to be deposited $1,500 in cash into the Bank of America savings account on May 6, 2010, approximately one week before he filed his First Amended Schedules.  Although the Debtor disclosed the Bank of America checking account in his Second Amended Schedules, he did not disclose the existence of the Bank of America savings account in his Second Amended Schedules filed on September 22, 2010, approximately four months after Teti's $4,000 wire transfer and the $1,500 cash deposit.

As noted above, at his § 341 meeting held on June 15, 2010, the Debtor testified that his Amended Schedules were accurate, just as he had earlier testified with respect to his original Schedules at the first § 341 meeting held on April 13, 2010 while his Chapter 13 case was pending.  The Debtor testified at the June 15, 2010 § 341 meeting that his Bank of America account (he did not specify that there were two) was opened after the petition date, but both the Bank of America checking account and savings account were opened on January 30, 2010, less than thirty days before the petition date.  The Debtor used both Bank of America accounts in the weeks and days before he filed his First Amended Schedules on May 13, 2010 and before the June 15, 2010 § 341 meeting for the direct deposit of his Harvard University paychecks, for the prompt withdrawal of funds for deposit in the Sovereign Bank

8

account, for the wire transfer of $4,000 from Teti on May 5, 2010, and for the deposit of $1,500 in cash in the Bank of America savings account on May 6, 2010.  The Debtor also used the Bank of America checking account just two days before the petition date when he made a $100 cash deposit.  Thus, the Debtor's  testimony at the June 15, 2010 § 341 meeting, like his testimony at his Rule 2004 examination, was untruthful.

Prior to the commencement of his bankruptcy case, the Debtor was owed an  account receivable in the amount of $2,500 for web site consulting services which he performed for a company known as ErgoKomfort.  The Debtor did not originally disclose the account receivable on Schedule B, although at his initial § 341 meeting on April 13, 2010 he indicated that that sum was owed to him.  The Debtor testified at his Rule 2004 examination, which was read into the record at trial, that all or almost all of the $2,500 prepetition receivable was paid to him in the several months immediately preceding his Rule 2004 examination which occurred in September of 2010.  Notwithstanding his testimony during his Rule 2004 examination, as well as his testimony at the § 341 meeting held on April 13, 2010, ErgoKomfort issued a check to Paul McCarthy, the Debtor's father, and the Debtor deposited those funds in the Sovereign Bank account standing in his father's name.

The Debtor testified at the initial § 341 meeting held on April 13, 2010 that "[t]here is a company in Lawrence that I have been doing web development for, several years, and they owe me about $2,500." McCarthy further testified that "I believe I listed it as income that I'd be invoicing at about $250 per month." The Debtor thus contended that he disclosed the prepetition account receivable in his Schedule I, rather than on Schedule B.

In addition to failing to disclose the existence of three bank accounts opened shortly before the commencement of his case and to properly disclose the account receivable, the Debtor also failed to disclose the existence of a sole proprietorship, namely his part-time consulting business, through which he performed web site consulting services for several years prior to the petition date and for which he deducted business losses to reduce his taxable income. Question 18 of the Statement of Financial Affairs explicitly required the Debtor to disclose all businesses in which he was a "sole proprietor" or was "self-employed" either "full-or-part-time within six years immediately preceding" the commencement of a bankruptcy.  The Debtor answered "None" in response to Question 18.

The Debtor, however, filed federal income tax returns for the years 2007, 2008 and 2009, including Schedule C, captioned "Profit or Loss From Business (Sole Proprietorship)." He used his sole proprietorship expenses to reduce the taxable income shown on his individual Form 1040 or, in the case of calendar years 2008 and 2009, to show a "Business income or (loss)" on line 12 of Form 1040 to reduce his taxable income.

Although the Debtor received tax benefits from his self-reported sole proprietorship, he failed to disclose the existence of his sole proprietorship in his Schedules or Statement of Financial Affairs.  The Debtor also failed to disclose either on his original Schedule B or his First Amended Schedule B three separate retirement accounts totaling more than $50,000, and he also failed to disclose on Schedule B his wedding band, which he said he wore at all times, as well as a copyrighted article, titled "Molecular Technology and the World System."

The following chart contains a summary of the Debtor's original Schedule B and

10

subsequent amendments, including the most recent amendment on July 27, 2012, as the

Debtor requested that this Court take judicial notice of the docket. The chart references in

summary form the types of property set forth on Schedule B.  The Court has only listed types

of property for which the Debtor amended his Schedules.

| Type of Prop. | Original Schedules 2/24/10 | First Amended 5/13/10 | Second Amended 9/22/2010 | Third Amended 11/22/2100 | Fourth Amended 7/27/2012 |
|---|---|---|---|---|---|
| Checking, savings or other financial accounts | NESC Fed. Credit Union Acct-2317 ($218) | NESC Fed. Credit Union Acct-2317 ($218) | Bank of Am. checking acct - 4446 ($30 [sic]) NESC Fed. Credit Union ($218) | Bank of Am. checking acct - 4446($130), savings acct-5813 NESC Fed. Credit Union Acct-2317 ($1,469.23) Various bank accounts, all believed to have been closed.[2] | Bank of Am. checking acct - 4446($130), savings acct-5813 NESC Fed. Credit Union Acct-2317 ($1,879.44) Various bank accounts, all believed to have been closed.[3] |
| Books, pictures and other art objects | None | None | 10 assorted books ($10) 5 used CDs ($10) | 10 assorted books ($10) 5 used CDs ($10) | 10 assorted books ($10) 5 used CDs ($10) |
| Furs and jewelry | None | None | Wedding band ($100) | Wedding band ($100) | Wedding band ($100) |

----

[2] The Debtor added:  "See attached statement." In the so-called "Supplemental Statement Accompanying Third Amended Schedules B &C," the Debtor stated that he had been "diagnosed with Attention Deficit Hyperactivity Syndrome, symptoms of which include disorganization, poor memory, and inability to manage financial details." He listed a number of bank accounts but stated that he was "unable to represent either that this list is complete, that he has used the correct names to refer to the banks, or that he actually closed these accounts when he stopped using them."

[3] The Debtor again added: "See attached statement."  He again professed an inability to represent that his list of accounts was complete.

| Interests in IRA, ERISA, Keogh or other pension or profit sharing plans | None | None | Innosight, LLC 401(k) ($3,526.53 on 12/31/09, not prop. of the estate) USC 401(a) and 403(b) plans ($33,382.50 on 12/31/2009, not prop. of the estate) | Innosight, LLC 401(k) ($3,526.53 on 12/31/09, not prop. of the estate) USC 401(a) and 403(b) plans ($33,382.50 on 12/31/2009, not prop. of the estate) | Innosight, LLC 401(k) ($3,526.53 on 12/31/09, not prop. of the estate) USC 401(a) and 403(b) plans ($33,382.50 on 12/31/2009, not prop. of the estate) |
|---|---|---|---|---|---|
| Accounts receivable | None | ErgoKomfort consulting fee ($2,500) | ErgoKomfort consulting fee ($2,500) | ErgoKomfort consulting fee ($2,500) | ErgoKomfort consulting fee ($2,500) |
| Equitable or future interests | None | None | None | Sovereign Bank Account-2829 in the name of Paul McCarthy ($585.97) | Sovereign Bank Account-2829 in the name of Paul McCarthy ($585.97) |
| patents, copyrights | None | None | Copyrighted article "Molecular Technology and the World System: (Reg. No. 677-587 issued 8/2/95) ($0) | Copyrighted article "Molecular Technology and the World System: (Reg. No. 677-587 issued 8/2/95) ($0) | Copyrighted article "Molecular Technology and the World System: (Reg. No. 677-587 issued 8/2/95) ($0) |
| Office equipment | None | None | Misc., including scanner ($192)[4] | Misc., including scanner ($192) | Misc., including scanner ($192) |

Despite the omissions and discrepancies, the Debtor testified that he did not knowingly and intentionally make a false oath and that he intended to answer questions

---

[4] The Debtor specifically listed a 10-year old laptop bag, 2 old, used USB external hard drives, 2 USB flash drives, a box of cables, a box of screen-cleaning wipes, a computer mouse, headphones, a mouse pad, nontransferable software and stock photography licenses, a power adapter for a laptop, a scanner and a wireless router.

honestly. His conclusory and incredible statements are contrary to the totality of the evidence.

Theresa Cerulli, M.D. ("Dr. Cerulli") testified on the Debtor's behalf. Dr. Cerulli testified that she specializes in neuropsychiatry and has an interest in attention deficit hyperactivity disorder ("ADHD"). She completed two fellowship programs, one in medical psychiatry and the other in neuropsychiatry. She has been in private practice for twelve years and serves on the professional advisory board for the Adult Attention Deficit Disorder Association. She is one of about 50 physicians certified by Major League Baseball to do ADHD evaluations for major and minor league players.

Dr. Cerulli described ADHD as follows:

> The simplest would be the 1994 DSM-IV,[5] which is kind of our encyclopedia in psychiatry as it exists now. That definition of attention deficit hyperactivity disorder would be the three core symptoms are: inattention, hyperactivity and impulsivity. The core symptoms have to impact at least several domains of the person's life. The symptoms by the definition again of 1994 have to have been present before age 7, even though the diagnosis does not have to be made until much later in life. There has to be some symptoms present earlier in life.

Dr. Cerulli added:

> We didn't, as clinicians, know much about Adult ADD [sic] or that it even existed. So in the years that I've been a specialist in this field there's been a lot more research done. It's much clearer now that 40 to 60 percent of children diagnosed with ADHD will continue to meet full criteria into adulthood, but that's a whole new area for us. So the DSM-V, which is due out in May of 2013, will likely look quite different in the way the diagnostic criteria is defined, so there's a lot of debate going on how to make it more applicable to adults now.

She asserted that "the clinical interview is still [the] gold standard" for diagnosis, considering

---

[5] DSM-IV is an acronym for Diagnostic and Statistical Manual of Mental Disorders, 4th edition.

family history, medical history, academic history, social, and interpersonal history.

Referencing various normative rating scales, Dr. Cerulli testified that she uses the "Quotient

ADHD test which is FDA approved as an adjunctive test for diagnosis . . . to double-check

that some of what we're seeing and hearing subjectively and on the rating scales  . .

.[through] . . .  some objective measure of attention impulse control and restlessness. . . ."

With respect to the manifestation of symptoms in adulthood, Dr. Cerulli indicated that

ADHD is "really cognitive problems in adults."  She elaborated as follows:

> . . . Problems with - - difficulty with sustained attention, so particularly  any
> kind of long, boring mundane task, any detailed work, very very difficult for
> them to pay attention to details. Careless errors are frequently made.
>       They have trouble with what we call  - -  frequently have trouble with
> executive functioning, which is trouble with organization, time management,
> goal-directed, goal-oriented behaviors. Good intent, often bad follow-through
> in these patients. They[,] with attentional problems[,] will often lose focus in
> a conversation so they'll miss details. They have a lot of problems
> problem-solving because they've missed details often  in a question and/or in
> listening to the response to the question.
>       They frequently struggle with paperwork. It's an enormous problem in
> adults with ADHD. They have trouble with financial paperwork. They have
> trouble with tax paperwork.  They have trouble with balancing a checking
> account. I have not had a single patient with ADHD in my practice that does
> this successfully.
>       It's often quite problematic for people in their relationships -- in their
> personal relationships, in their professional relationships because of this and
> they often feel a great deal of shame. And so they don't -- the most difficult
> part is they're presenting as somebody who's fine to the rest of the world and
> they know internally they're struggling with everyday tasks that most people
> do with more ease, so there's a lot of embarrassment.
>       The second of the three core symptoms, hyperactivity,  in adulthood
> doesn't look like the person running around the classroom. It's a restlessness.
> It's a fidgety-ness. . . .
>       Finally, the third area, the impulse control, impulsive - - impulsivity
> problems, they'll often speak before they think. They don't think through
> consequences, which is problematic in childhood and adulthood for many
> different reasons but certainly with adults it's why they get into trouble with -

14

- often relationships with employers, and legal problems.

Dr. Cerulli further testified that people with ADHD are generally above average in intelligence.

With respect to treatment, Dr. Cerulli noted that the "best treatments we have are medication management" coupled with behavioral strategies to help people manage the kinds of difficulties they encounter.  She testified that the prognosis for ADHD patients is "not pretty" as they suffer from "higher rates of car accidents, higher rates because of the difficulty with attention concentration of impulse control, lower overall average income, higher period  - - rates of unemployment, higher divorce rates among adults with ADHD, higher rates of STDs, higher rates of unwanted pregnancies," as well as much higher rates of depression, anxiety disorders, and substance abuse.

Dr. Cerulli testified that she has been the Debtor's treating psychiatrist since July 15, 2011, notably at a time when this adversary proceeding had been pending for approximately nine months.  She stated:

> On July 15, 2011 I did my typical hour-long interview – clinical interview with all of the history information, had him bring any prior records that he had had, as I do with all of my patients. So part of that evaluation included a neuropsychological battery he had done at Mass General Hospital that he brought with him. We administered -- I administered the rating scales. I gave him some rating scales for others to fill out. We often ask for collaborative information, which is typical on an evaluation; family members, an employer, a co-worker, spouse. And then on July 25th he returned to do the ADHD Quotient test, the objective test that's computerized that I mentioned, that's now available, FDA approved, an adjunctive test for ADHD.

Additionally, the Debtor's spouse, mother and father completed rating scales, and the Debtor completed a so-called Conners Self-Rating Scale.  She also performed a Quotient ADHD test

15

and a Continuance Performance Task test.  In addition, she reviewed the Debtor's evaluation from a neuropsychological perspective which was prepared by staff at the Massachusetts General Hospital.  Based upon the battery of tests and evaluations, Dr. Cerulli, in her professional opinion, concluded that the Debtor suffers from ADHD.  She is treating him with "a long-acting form of Ritalin."

Although Dr. Cerulli did not have knowledge of specific problems the Debtor may have had completing his Schedules, she testified hypothetically that the Debtor would have struggled to produce  38 different categories of documents in response to the requests set forth in the Plaintiff's Motion for a Rule 2004 examination.  In addition, she, like the Debtor, misconstrued the balance in his NESC Federal Credit Union account.  With respect to the personal property inventory, Dr. Cerulli testified:

> It would have been a struggle because of the level of detail it's requesting and that sometimes the prompts may look helpful but deceivably so because if there wasn't something specific listed on the prompts, it would have been probably thought irrelevant or not cued even to be able to pulled from working memory. So prompts are helpful, but if it's not exact there's gonna be a problem with the person self-generating anything that wasn't on here.

Dr. Cerulli concluded that a person with ADHD would likely have failed miserably at correctly and completely preparing his bankruptcy Schedules and Statement of Financial Affairs in a way that would have disclosed all of the property that he has, all of his bank accounts, and all of his retirement accounts. She explained that a person with ADHD would be unable to sustain attention and would be plagued with problem solving and memory problems.  With respect to the Debtor's failure to disclose the Sovereign Bank account in his father's name and his Bank of America checking and savings accounts, she stated:

16

> It does not surprise me that there are details missing on a form that is as
> lengthy as that petition and quite frankly as confusing as that petition. The
> way somebody's brain with ADHD works it's complicated, but working
> memory is one of the pieces that they do struggle with. That's the ability to
> take in information, manipulate it and problem solve. It does not surprise me
> that Tom wasn't able to self-generate the information at the right time on the
> right spot on paperwork as you saw. My sense is if you directly asked him,
> gave an account number and the specific information, and said "Is this or is
> this not your account?" that would have been the easy answer; to ask it to be
> self-generated days later is not easy for someone with ADHD.

Dr. Cerulli also testified about the Debtor's signature attesting to the truth and correctness

of his schedules under penalty of perjury to the best of his knowledge, information and

belief.  She stated:

> I would be careful to say one can never know somebody's thoughts or intent
> 100 percent. Given what I know of Tom,  however, I believe in signing this he
> felt he was answering the questions to the best of his ability and information
> to what he wrote on and would not have been thinking about what he did not
> write on (a). Part (b) to my answer on that -- part (b) and (c), (b) I don't know
> how carefully anyone with ADHD would even read the question before
> signing. And (c) in signing it even thinking of what he left off of there he still
> probably thought he was representing it to the best of his ability and so it still
> could be considered an accurate answer.

She testified with respect to the accuracy of the Debtor's answers to questions appearing on

the Statement of Financial Affairs.  With respect to discrepancies in his testimony about his

work for ErgoKomfort, Dr. Cerulli stated that in someone with ADHD she expected there to

be discrepancies, adding "[t]he intent is what we're all trying to seek here, not the fact that

there was a discrepancy."  With respect to the Debtor's intent, she testified:

> My experience is that this is exactly what untreated ADHD looks like in
> adulthood, that somebody with ADHD suffers with difficulties and often can
> appear fine to others and deals with the shame of masking everyday what it's
> like to look fine medically and to not be cognitively. And it has even more
> frustration that it carries for them, that their level of intelligence is often high,

17

that they're in quite responsible positions -- attorneys, doctors, CEOs, accountants -- and yet they fail in the day-to-day things that they need to do in their own life that are this detailed work.

It does not mean that the person is intentionally trying to deceive or fail. If you look at the circumstances, Tom isn't hiding thousands and thousands and thousands of dollars of assets.

Dr. Cerulli concluded the Debtor could not have accurately completed his bankruptcy

Schedules and Statement of Financial Affairs, adding:

I would describe that working memory and memory are quite different. Someone with ADHD generally struggles with working memory problems, not with memory problems. Working -- let me do it the other way around. Memory, if I said TR testing somebody's memory, I might ask you what's the name of the president. Someone with ADHD would have no difficulty answering that. It's a well-stored piece of information that they are simply trying to recall. It's there over long periods of time. Working memory is usually with any kind of new learning of information. That's where someone with ADHD will struggle the most. In Tom's case some of his testing from Mass General alluded to the problems with working memory relative to his level of intelligence. Again, the diagnosis is a clinical one, so the testing doesn't matter as much as just having the diagnosis itself and knowing that with ADHD working memory generally is a problem.

On cross-examination, Dr. Cerulli admitted that "no one can judge someone's intent.

. . ."  In addition, she admitted that she reviewed the neuropsychological evaluation report

prepared by the Massachusetts General Hospital's Psychology Assessment Center, which

indicated that the Debtor had a high average to superior baseline level of functioning, that

his neuro-cognitive profile was clinically intact across all cognitive domains with the

exception of poor sustained intelligence and vigilance.  The staff at the Massachusetts

Hospital also stated:

Of note, an area or *mild relative weakness*; i.e., in the context of his above-average cognitive baseline was seen in other aspects of attention in executive functioning, although it should be emphasized that those functions were still

within normal limits clinically."

(emphasis supplied).  The authors of the report also determined that the Debtor's working memory was in the 50th percentile and his arithmetic classification was superior, and they noted his ability to super-focus or hyper-focus on certain tasks.  Nevertheless, Dr. Cerulli testified that the testing done at the Massachusetts General Hospital was neither objective nor dispositive with respect to an ADHD diagnosis.

## III. DISCUSSION

TestMasters's Amended Complaint contains three counts pertaining to the denial of the Debtor's discharge under 11 U.S.C. § 727(a)(2)(B), (a)(3) and (a)(4).  Those subsections provide in pertinent part the following:

(a) The court shall grant the debtor a discharge, unless--

(1) the debtor is not an individual;

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed-- . . .

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case--

19

> (A) made a false oath or account;
> (B) presented or used a false claim;
> (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs;

11 U.S.C. § 727(a)(2)(B), (3), and (4).

Addressing section 727(a)(4) first, the United States Court of Appeals for the First Circuit has ruled that "the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact." Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1987). The First Circuit added that "[t]he burden of proof rests with the trustee [or creditor]," In re Shebel, 54 B.R. 199, 202 (Bankr.D.Vt.1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." In re Tully, 818 F.3d at 110 (citing Matter of Mascolo, 505 F.2d 274, 276 (1st Cir.1974)). Finally, the First Circuit observed:

> The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor. Matter of Vickers, 577 F.2d 683, 687 (10th Cir.1978); In re Leichter, 197 F.2d 955, 959 (3d Cir.1952), cert. denied, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); Roberts v. W.P. Ford & Son, Inc., 169 F.2d 151, 152 (4th Cir.1948). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." Dilworth v. Boothe, 69 F.2d 621, 624 (5th Cir.1934).

20

> On the other hand, the very purpose of certain sections of the law, like 11
> U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the
> bankruptcy code do not play fast and loose with their assets or with the reality
> of their affairs. The statutes are designed to insure that complete, truthful, and
> reliable information is put forward at the outset of the proceedings, so that
> decisions can be made by the parties in interest based on fact rather than
> fiction. As we have stated, "[t]he successful functioning of the bankruptcy act
> hinges both upon the bankrupt's veracity and his willingness to make a full
> disclosure." Mascolo, 505 F.2d at 278. Neither the trustee nor the creditors
> should be required to engage in a laborious tug-of-war to drag the simple truth
> into the glare of daylight. See In re Tabibian, 289 F.2d 793, 797 (2d Cir.1961); In
> re Shebel, 54 B.R. at 202.

In re Tully, 818 F.2d at 110. See also Comm. of Mass. v. Sohmer (In re Sohmer), 434 B.R. 234,

249 (Bankr. D. Mass. 2010). The First Circuit has emphasized that "[s]worn statements filed

in any court must be regarded as serious business. In bankruptcy administration, the system

will collapse if debtors are not forthcoming. . . . The law, fairly read, does not countenance

a petitioner's decision to play a recalcitrant game, one where the debtor hides, and the trustee

is forced to go seek." Tully, 818 F.3d at 112.

    In In re Sohmer, this Court quoted In re Tully and also referenced a Fifth Circuit

decision, The Cadle Co. v. Duncan (In re Duncan), 562 F.3d 688, 696 (5th Cir.2009), observing

that the Fifth Circuit stated the following on the issue of intent and materiality:

> To prevail on a claim under this subsection, an objecting
> plaintiff (a creditor or the trustee) must prove by a
> preponderance of the evidence "that (1) the debtor made a . . .
> statement under oath; (2) the statement was false; (3) the debtor
> knew the statement was false; (4) the debtor made the statement
> with fraudulent intent; and (5) the statement was material to the
> bankruptcy case." Sholdra v. Chilmark Fin. LLP (In re Sholdra),
> 249 F.3d 380, 382 (5th Cir.2001) (citing Beaubouef v. Beaubouef
> (In re Beaubouef), 966 F.2d 174, 178 (5th Cir.1992)).
> Circumstantial evidence may be used to prove fraudulent intent,
> id., and the cumulative effect of false statements may, when

21

taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent, *see* id. at 383.

False statements in the debtor's schedules or false statements by the debtor during the proceedings are sufficient to justify denial of discharge. Beaubouef, 966 F.2d at 178. Further, the materiality of an omission is not solely based on the value of the item omitted or whether it was detrimental to creditors. Id. Rather, the statement need only "bear [ ] a relationship to the bankrupt's business transactions or estate, or concern[ ] the discovery of assets, business dealings, or the existence and disposition of his property." Id. (quoting Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 617 (11th Cir. 1984)). Indeed, [t]he recalcitrant debtor may not escape a section 727(a)(4)(A) denial of discharge by asserting that the admittedly omitted or falsely stated information concerned a worthless business relationship or holding; such a defense is specious. It makes no difference that he does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.

Id. (quoting Chalik, 748 F.2d at 618).

In re Sohmer, 434 B.R. at 250. *See also* Lussier v. Sullivan (In re Sullivan), 455 B.R. 829 (B.A.P. 1st Cir. 2011).[6]

The Court finds that TestMasters unequivocally established that the Debtor omitted assets from his original Schedule B, and his First Amended Schedule B, Second Amended Schedule B and Third Amended Schedule B. Specifically, the Court finds that the Debtor failed to list the Sovereign Bank account in his father's name, which he established on January 30, 2010, prior to the commencement of his bankruptcy case, and used as his own.

---

[6] The Court notes that there would appear to be no material differences between the First Circuit's two-part test and the Fifth Circuit's five-part test. The Fifth Circuit simply used more words.

The Court finds that the Debtor knowingly and fraudulently made a false oath relating to a material fact by omitting the Sovereign Bank account, by omitting the Bank of America checking and savings accounts, and by under-reporting the amount of money in the NESC Federal Credit Union account.   The Debtor's later admissions simply do not excuse his cavalier disregard for his duty to truthfully and completely disclose his assets.  *See* 11 U.S.C. 521(a)(1)(B)(i).

As the court noted in Angell v. Williams (In re Williams), No. 08-188, 2010 WL 364459 at *6 (Bankr. E.D.N.C. Jan. 27, 2010),

> Fraudulent intent may be established by circumstantial evidence or inferred from a course of conduct. Williamson v. Fireman's Fund Ins. Co., 828 F.2d 249, 252 (4th Cir. 1987); In re Slattery, 333 B.R. 340, 345 (Bankr. D. Md. 2005). A reckless disregard for the truth may be evidence of fraudulent intent. In re Hatton, 204 B.R. 477, 484 (E.D. Va. 1997). While an inadvertent mistake is not cause for the denial of a discharge, a pattern of omissions and inaccuracies on a debtor's sworn schedules indicates a reckless disregard for the truth. In re Slattery, 333 B.R. at 346 (omissions of real property on schedules evidences at minimum a reckless disregard for the truth equivalent to fraud); In re Hooper, 274 B.R. 210, 219 (Bankr. D.S.C. 2001) (finding that numerous inaccuracies on schedules and statement of financial affairs displayed a reckless disregard for the truth); In re Hatton, 204 B.R. at 484 (holding that the failure to list on petition various insider transactions and expenditures constituted a pattern of concealment and nondisclosure from which fraudulent intent could be inferred). Certainly, a debtor's honest confusion or lack of understanding may weigh against an inference of fraudulent intent. In re Hatton, 204 B.R. at 484. A debtor's prompt efforts to amend any misstatements may also weigh against a finding of fraudulent intent; however, the failure to amend may weigh in favor of fraudulent intent. In re Oliver, 414 B.R. 361, 374–75 (Bankr. E.D. Tenn. 2009) ("a debtor who mistakenly or inadvertently provides false information or fails to disclose pertinent information and takes steps to amend his schedules to correct them prior to or during a meeting of creditors is not generally thought to possess the requisite fraudulent intent to deny discharge under § 727(a)(4)(A)"); In re Cole, 378 B.R. 215, 222 (Bankr. N.D. Ill. 2007) (finding that debtor acted with reckless indifference to the truth in not offering an explanation for misstatement and not amending schedules).

23

In re Williams, 2010 WL 364459 at *9. Evaluating the Debtor's conduct with respect to the circumstantial evidence of fraudulent intent, the Court concludes that TestMasters satisfied its burden of proof by a preponderance of the credible evidence.

The Debtor would have this Court excuse his failure to comply with the requirements of the Bankruptcy Code, see 11 U.S.C. § 521 (a)(1)(B)(i), and accept that he lacked the requisite fraudulent intent because he suffers from ADHD. The Court unequivocally rejects the Debtor's explanation for his repeated false oaths for a number of reasons. In the first place, Dr. Cerulli testified that although the symptoms of ADHD make it difficult for some individuals to organize, manage, and remember financial information, she could not testify to the Debtor's intent. The Court finds that there was compelling evidence of the Debtor's intent to falsify his list of assets. Second, his protestation of his inability to properly disclose his assets was not credible. The Debtor was able to establish and execute a system enabling him to deposit income in undisclosed accounts and shield prepetition income from the potential reach of TestMasters by having ErgoKomfort issue checks to his father and then depositing those checks into an account in his father's name.[7] That conduct, coupled with his decision to shred bank account statements, undermines any credence this Court would or could give to the Debtor's postpetition ADHD diagnosis. The Debtor, faced with a six figure judgment entered on July 28, 2009 and the seizure of his bank account by TestMasters, orchestrated a series of transactions whose purpose could only have been to conceal property

---

[7] For example, assuming TestMasters could establish that the Debtor's obligation to it was nondischargeable under 11 U.S.C. § 523(a)(2) or (a)(6), the Debtor would have been able to "hide" the money received from ErgoKomfort and some of his income from it in the Sovereign Bank account that was in his father's name.

from TestMasters.  The Debtor, shortly before the commencement of his case, opened checking and savings accounts at Bank of America and, most tellingly, an account at Sovereign Bank in his father's name through which he funneled his pay checks and his account receivable from ErgoKomfort.  The Debtor's testimony was not believable.  His evasions and reliance on a poor memory, while consistent with an ADHD diagnosis, were not compelling, particularly where his memory seemed to improve when he was questioned by his counsel.  The Court concludes the Debtor's testimony reflected a recent contrivance to avert responsibility for dishonesty, rather than actual incapacity, particularly in view of his marketable computer skills which he conceivably could have used to organize his affairs.

The Debtor may suffer from ADHD, but the Court is not convinced that his condition obviated his ability to understand the concept of perjury and the consequences of perjury when he signed his Schedules and Statement of Financial Affairs under "penalty of perjury." The Debtor is intelligent, has significant computer skills, and has the capability of holding a responsible job at the Harvard Graduate School of Education.  The Court does not believe his memory was egregiously impaired because his accomplishments belie this contention. His testimony as to his intentions was incredible and evasive based on this Court's observation of his demeanor during direct and cross-examination. In sum, the totality of the Debtor's conduct establish grounds for the denial of his discharge not only under § 727(a)(4)(A), but under (a)(2)(B) and § 727(a)(3).

TestMasters satisfied its burden under § 727(a)(2)(B) as the Debtor unquestionably concealed property of the estate, namely the undisclosed bank accounts and his retirement

accounts, after the petition date.  While the monies in his bank accounts and his retirement

accounts may be exempt, the Debtor was obliged to disclose them.  His failure to promptly

correct Schedule B evidences intent to conceal assets and to hinder and delay TestMasters.

With respect to § 727(a)(3), in Razzaboni v. Schifano (In re Schifano), 378 F.3d 60 (1st

Cir.2004), the First Circuit articulated the standards for denial of discharge under 11 U.S.C.

§ 727(a)(3). It stated:

> Although this court has not yet squarely addressed the issue raised in §
> 727(a)(3), our sister circuits have described the standards for disclosure of
> records under the Act.
>
>> It is a question in each instance of reasonableness in the
>> particular circumstances. Complete disclosure is in every case
>> a condition precedent to the granting of discharge, and if such
>> a disclosure is not possible without the keeping of books or
>> records, then the absence of such amounts to that failure to
>> which the act applies.
>
> Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir.1992) (citing In re
> Underhill, 82 F.2d 258, 259–260 (2d Cir.), cert. denied, 299 U.S. 546, 57 S.Ct. 9, 81
> L.Ed. 402 (1936)). Therefore, "[w]hile a debtor may justify his failure to keep
> records in some cases, a discharge may be granted only if the debtor presents
> an accurate and complete account of his financial affairs." Alten, 958 F.2d at
> 1230.

In re Schifano, 378 F.3d at 68. Thus, § 727(a)(3) "does not require that a debtor maintain

perfect records."  Angell v. Williams (In re Williams), No. 08-188, 2010 WL 364459  at *6

(Bankr. E.D.N.C. Jan. 27, 2010)(citing In re French, 499 F.3d 345, 355 (4th Cir.2007)). "'A

debtor is, however, obliged by the statute to preserve sufficient and adequate financial

records to enable the court and the parties to reasonably ascertain an accurate picture of his

financial affairs.'" Id. (citations omitted).  As the court observed in Williams, "[i]ntent is not

an element of a claim under this subsection. Once the Trustee demonstrates that the debtor

failed to preserve sufficient and adequate financial records, the burden shifts to the debtor

to show that such failure was justified under the circumstances." Id.  Courts examine the

following circumstances:

> 1. Whether the debtor was engaged in business, and if so, the complexity and volume of the business;
>
> 2. The amount of the debtor's obligations;
>
> 3. Whether the debtor's failure to keep or preserve books and records was due to the debtor's fault;
>
> 4. The debtor's education, business experience and sophistication;
>
> 5. The customary business practices for record keeping in the debtor's type of business;
>
> 6. The degree of accuracy disclosed by the debtor's existing books and records;
>
> 7. The extent of any egregious conduct on the debtor's part; and
>
> 8. The debtor's courtroom demeanor.

In re Sohmer, 434 B.R. at 257 (citing Christy v. Kowalski (In re Kowalski), 316 B.R. 596, 601-02

(Bankr. E.D.N.Y. 2004), and Krohn v. Frommann (In re Frommann), 153 B.R. 113, 117

(Bankr.E.D.N.Y.1993)).

In In re Williams, the debtors failed to keep and preserve sufficient records to enable

the Trustee to assess their financial condition. Mr. Williams, a mortgage broker, maintained

that he suffered from ADHD which prevented him from maintaining the records.  Mrs.

Williams did not attempt to compensate for her husband's lack of diligence. The bankruptcy

court rejected the ADHD defense, holding that the debtors' explanation was inadequate.

27

This Court, considering the factors set forth in <u>Sohmer</u> and in particular the Debtor's impressive educational credentials, the magnitude of the debt held by TestMasters, the relatively uncomplicated state of his financial affairs, and his demeanor as a witness, concludes that the Debtor's failure to preserve books and records warrants denial of his discharge.  The Debtor's reliance upon his ADHD diagnosis to avoid responsibility for accurately maintaining basic records and disclosing his financial affairs is inadequate to overcome the weight of the circumstantial evidence.  Had the Debtor omitted one or even two assets and promptly corrected his Schedules to account for omitted assets, the Court would be inclined to accept the Debtor's explanation for the deficiencies in his Schedules and Statement of Financial Affairs.  The Debtor, however, faced with a six figure judgment elected to obfuscate and delay. It took him well over a year and a half after the commencement of his Chapter 13 case to complete Schedules with integrity.

The Court concludes that a defense of ADHD is not available under the circumstances of this case as the requirements of the Bankruptcy Code as interpreted by the United States Court of Appeals for the First Circuit requires attention to the Schedules and Statement of Financial Affairs to maintain the integrity of the bankruptcy system.  The filing of a bankruptcy case, as the United States Court of Appeals recognized in <u>In re Tully</u>, requires "those who seek the shelter of the bankruptcy code . . . not [to] play fast and loose with their assets or with the reality of their affairs" . . . [because] . . . [t]he statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than

fiction." <u>Tully</u>, 818 F.2d at 110.  It is clear to this Court that the Debtor recklessly failed to meet that standard and his ADHD cannot excuse his cavalier approach to his bankruptcy case and the functioning of the bankruptcy system.  To hold otherwise, would upend the policies of the Bankruptcy Code set forth in <u>Tully</u>, which hinge "'both upon the bankrupt's veracity and his willingness to make a full disclosure.'" <u>Id.</u> (citation omitted). Although the Debtor stated that he did not intended to conceal assets and the assets he omitted are exempt, the circumstantial evidence and the Debtor's lack of credibility compel the Court to conclude that TestMasters sustained its burden of proof and the Debtor is not entitled to a discharge under 11 U.S.C. § 727(a)(2), (3), and (4).

## IV. CONCLUSION

In view of the foregoing, the Court shall enter judgment in favor of TestMasters and against the Debtor on Counts III through V of the Plaintiff's Complaint.  Counts I and II are moot.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  August 27, 2012